**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SEBRON HARMON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **CV 01-BU-0415-E** |
| | ) | |
| CITY OF TALLADEGA, | ) | |
| ALABAMA, et al., | ) | |
| | ) | **ENTERED** |
| Defendant. | ) | |
| | ) | NOV 1 6 2001 |
| | ) | |
| | ) | |

---

# MEMORANDUM OPINION

---

In his remaining claims in this action, i.e. all those not abandoned or conceded, Plaintiff Sebron Harmon ("Plaintiff" or "Harmon") asserts that Defendants Dr. Horace Patterson, Sr. ("Patterson") and Sandra Cameron ("Cameron") are liable under 42 U.S.C. § 1983 for injuries and damages he suffered as a result of being arrested and prosecuted for solicitation to commit the crime of criminal mischief in the second degree. Harmon asserts that he was arrested and prosecuted without probable cause, as the Defendants subverted the criminal justice system for improper purposes. Now pending before the Court is Defendants' motion for summary judgment (Doc. No. 9), filed in this Court on October 1, 2001. Cameron, Patterson and Harmon have filed evidence and briefs in support of their respective

positions on the motion, which is now ripe for decision.  Upon due consideration, the Court concludes that Defendants' motion is due to be GRANTED in part and DENIED in part.

In addition, pursuant to the stipulation in Harmon's opposition brief (Doc. No. 11), all claims against Defendants City of Talladega ("City") and Eddie Tucker ("Tucker") are abandoned, as are certain  state law claims of Plaintiff Accordingly, all claims against Defendants City and Tucker, as well as Harmon's state law claims for interference with contractual relations and abuse of process against Defendants Patterson and Cameron, are due to be DISMISSED WITH PREJUDICE.

## I.  FACTUAL BACKGROUND[1]

This case involves a dispute over alterations made to a monument by a professional educator.  Plaintiff Harmon is the Director of the Tri-Systems Learning Center.  The Center is an alternative school for students who have been removed from the general school system due to behavioral problems.  Harmon has been an educator for thirty-one years in Talladega County, working his way from teacher up to principal.  Prior to December of 2000, Harmon served as the President of the Westside Drury Alumni Association ("the Association").  Harmon had been affiliated with the Association for over 15 years at the time of the events at issue.

---

[1]"The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the record.  These are the 'facts' for summary judgment purposes only.  They may not be the actual facts.  See Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1400 (11th Cir. 1994)."  Underwood v. Life Ins. Co. of Georgia, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

In late 1998 or early 1999, the Association jointly decided to take steps to erect a monument in honor of deceased administrators of Westside High School ("the project" or "the monument"). The proposed monument was to be a three-sided brick sign with granite inserts. The first insert would read, "Westside Park and Community Complex"; the second, "Westside/Drury Alumni Association, Talladega Recreation Department, July 4, 1998"; the third, "The Principals of Westside High School: H.O. Wilson 1918-1919; I.A. Rodgers 1919-1920; E.G. Brown 1925-1949; B.N. Mabra 1949-1970. Their Creative Genius Lit Lamps of Hope in the Black Community." The selected site for the monument was the old high school, now the home of the B.N. Mabra Center. The B.N. Mabra Center ("the Mabra Center") is a City recreation facility located on Talladega City property.

Arthur Lane ("Lane") served as Advisor to the Association at the time and was charged with soliciting funds for the project. Lane first approached the Recreation Board regarding the monument, but they were unwilling to provide any funds for the sign. Lane then approached the President of the Talladega City Council, Dr. Horace Patterson, about the project. Patterson agreed to support funding for the project and arranged to have the matter presented to the entire City Council on April 5, 1999. The City Council unanimously agreed to provide the $6,000 needed to build the monument, and required nothing of the Association other than that they produce receipts for all expenditures.

Lane supervised the construction of the monument during the late spring and summer of 1999. At some point during that time period, Patterson contacted Lane and requested that

Patterson's name be added to the monument. Lane complied with the request and had Patterson's name inscribed on the sign. On July 4, 1999 the sign was unveiled to the public. Apparently, members of the Association were displeased with the addition of Patterson's name to the sign and communicated their displeasure to Lane. Lane spoke to Patterson and told him that the Association wished to change the sign, excising Patterson's name. Patterson told Lane that any modifications that the Association wished to effect would have to be funded from the Association's coffers. Patterson testified that he also told Lane that the Association would have to present its proposed changes to the City Council for its approval; Harmon avers that Patterson did not qualify his response by pointing to any City Council-voting prerequisite.

Harmon and Lane endeavored to retain a brick mason to modify the sign. After contracting with one Lance Smoot ("Smoot") to perform the work, Harmon and Lane ordered a new granite slab. It is undisputed that all expenses were covered by the Association, and that the City paid for none of the alterations. Prior to ordering the new rock, Harmon, Lane and Smoot visited the Mabra Center monument site to take measurements for the order. Defendant Sandra Cameron, director and nutrition manager of the Mabra Center, happened upon the men during the consultation.[2] Cameron asked the men what they were doing there. Harmon replied that they were taking measurements in preparation for altering

---

[2]Defendant Cameron sat on the B.N. Mabra Decoration Committee along with Defendant Patterson's wife. Cameron and Dr. Patterson have been friends since 1977.

the monument.

On the afternoon of October 16, 1999, Smoot began performing the work of replacing one of the granite slabs. Cameron quickly became aware of the work being done and traveled to the monument site.[3] Cameron told the workers to stop working on the monument, as the work was unauthorized. Cameron contacted the police and left a message with Lane's wife. She then hurried to Patterson's home to alert him to the work being done on the monument. Cameron returned to the Mabra Center and called the police a second time.

A police officer arrived at the Mabra Center at around the same time as did Lane, Harmon and Patterson. Patterson was irate, levying accusations against Plaintiff regarding the work on the monument. Plaintiff left the scene after telling the officer that Plaintiff had hired Smoot to do the work. On Monday, October 18, 1999, Harmon met with the mayor of Talladega about matters unrelated to the monument. The mayor informed Harmon that certain individuals were working to have him arrested. Indeed, Cameron swore out an arrest warrant against Harmon on October 20, 1999. On October 21, 1999, the Plaintiff was arrested at his home pursuant to an arrest warrant on charges of solicitation to commit criminal mischief in the second degree.

On November 1, 1999, Plaintiff and his attorney appeared before the City Council for a meeting to resolve the final appearance of the monument. At this meeting, Patterson

---

[3]The date chosen for the monument work was a Saturday. Cameron was at home when she heard that workers were altering the monument. Whether it was Plaintiff or Smoot who selected a Saturday for the performance of the work is disputed.

delivered a caustic diatribe against Harmon, essentially arguing that Harmon was a common vandal deserving of common punishment for his crimes. Patterson warned that if Harmon were not fully prosecuted for his crime, unruly youth would run roughshod over Talladega undeterred by its unpredictable criminal justice system. In addition, Patterson presented evidence at this meeting that he had collected relating to Harmon's actions in the days between October 16 and November 1.[4]

On December 15, 1999, Harmon stood trial in Talladega Municipal Court on criminal charges. At the close of the bench trial, the court convicted Harmon of solicitation to commit criminal mischief in the second degree for his role in the October 16, 1999 incident. Harmon then appealed the trial court's determination of guilt to the Circuit Court of Talladega County. On appeal, a jury found Harmon not guilty and acquitted him.[5] After Plaintiff was acquitted, the Association was allowed to complete the monument by paying for a new granite slab out of the Association's funds. At the commencement of this litigation, Patterson's name no longer appeared on the sign.

---

[4]Patterson had requested that the city clerk  prepare a list of invoices reflecting the costs and payment for materials and labor to construct the monument. Patterson also requested that the marble company verify the identity of the member of the Association with whom it had dealt in the ordering of the second granite slab.

[5]It is unclear on what grounds Harmon was acquitted on appeal. Plaintiff conjectures that the two fatal infirmities in the State's case were: (1) that the State could not prove that Harmon had enlisted two, as opposed to one, workers for the monument alteration, and (2) that the State could not prove damage to the property at issue rising to the statutorily prescribed amount (between $251 and $1000). As will be discussed infra, such a determination is not relevant to Harmon's claims.

## II. SUMMARY JUDGMENT STANDARDS

On a motion for summary judgment, the court assesses all of the proof the parties can bring to bear in order to ascertain whether a genuine need for trial exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A party seeking summary judgment has the initial responsibility of informing the Court of the grounds for the motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. However, "Rule 56 . . . does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's opposition." Jones v. Sheehan, Young & Culp, P.C., 82 F.3d 1334, 1338 (5th Cir. 1996); see also Resolution Trust Corp., 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden on the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."), cert. denied sub. nom., 516 U.S. 817 (1995).

Once the moving party has satisfied its initial burden, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's

case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 523 (11th Cir. 1994).  In resolving whether a given factual dispute requires submission to a jury, a district court must view the record in the light most favorable to the nonmoving party and resolve all reasonable inferences in the nonmovant's favor. Rooney v. Watson, 101 F.3d 1378, 1380 (11th Cir. 1996) (citing Hale v. Tallapoosa Co., 50 F.3d 1579, 1581 (11th Cir. 1995)).

### III. DISCUSSION

Harmon brings a Fourth Amendment malicious prosecution claim against Defendants Cameron and Patterson through 42 U.S.C. § 1983.  Since substantive rights do not originate from Section 1983, a civil rights plaintiff must allege the violation of a specific constitutional right. Albright v. Oliver, 510 U.S. 266, 271 (1994) (citing Baker v. McCollan, 443 U.S. 137, 144 n.3(1979)).  Harmon alleges that he has been maliciously prosecuted in violation of his Fourth Amendment rights and that he suffered damages as a result of this violation.

The Fourth Amendment protects against "unreasonable . . . seizures." U.S. CONST. Amend. IV.  Though the Supreme Court has held that there is no substantive due process right under the Fourteenth Amendment to be free from malicious prosecutions, the Court has never addressed whether claims of malicious prosecution are otherwise actionable under the Fourth Amendment. Albright, 510 U.S. at 275.  In the Eleventh Circuit, however, it is well-settled that malicious prosecution is actionable if a plaintiff demonstrates a restraint of his liberty consistent with the concept of a seizure. See, e.g., Uboh v. Reno, 141 F.3d 1000,

1002-003 (11th Cir. 1998); Whiting v. Traylor, 85 F.3d 581, 584 (11th Cir. 1996).

> The Fourth amendment right implicated in a malicious prosecution action is the right to be free of unreasonable seizure of the person–i.e., the right to be free of unreasonable or unwarranted restraints on personal liberty. A plaintiff asserting a Fourth Amendment malicious prosecution claim under § 1983 must therefore show some deprivation of liberty consistent with the concept of a "seizure."

Singer v.Fulton County Sheriff, 63 F.3d 110, 116 (2d Cir. 1995); accord, Whiting, 85 F.3d

581, 583 n.4 ("[W]e think referring to a federal 'right' to be free from malicious prosecution

is actually a description of the right to be free from an unlawful seizure which is part of a

prosecution.").

While the courts have traditionally "looked to the common law for guidance" in

determining the elements of a Section 1983 malicious prosecution claim, see Uboh, 141 F.3d

at 1004, the gravamen of the plaintiff's claim is the Fourth Amendment violation.

> Labeling . . . a section 1983 claim as one for "malicious prosecution" can be a shorthand way of describing a kind of legitimate section 1983 claim: the kind of claim where the plaintiff, as part of the commencement of a criminal proceeding, has been forcibly restrained in violation of the Fourth Amendment, and injuries, due to that seizure, follow as the prosecution goes ahead. So, [the plaintiff] can avoid an order of dismissal if he based his claim, whatever he calls it, on some actual unlawful, forcible, restraint of his person.

See Whiting, 85 F.3d at 584 (footnote omitted). The Eleventh Circuit's reasoning in *Whiting*

has been favorably cited and placed alongside the majority of circuit courts in finding that

a Section 1983 malicious prosecution action need not depend slavishly on state law elements. See Frantz v. Village of Bedford, 245 F.3d 869, 873 (6th Cir. 2001) (following the majority trend and holding that the elements of the constitutional malicious prosecution claim cannot depend upon state law); see also, Darrah v. City of Oak Park, 255 F.3d 301, 311-12 & n.4 (6th Cir. 2001) (recognizing that, after *Frantz*, the Sixth Circuit may no longer rely on the state law of malicious prosecution in analyzing federal malicious prosecution claims). Cf. Walker v. Briley. 140 F. Supp. 2d 1249, 1257 n.6 (N.D. Ala. 2001) ("The core issue with respect to any section 1983 claim is whether a constitutional violation has occurred, not whether the elements of a particular common law tort can be made out.").

The elements that a plaintiff must demonstrate in order to make out a federal malicious prosecution claim in the Eleventh Circuit comport with the elements as limned by the Second Circuit in *Singer*. The *Singer* court essentially relied on the following elements: (1) a deprivation of liberty, (2) resulting from a governmental seizure, (3) in the form of legal process, (4) without probable cause or otherwise unreasonable, and (5) termination of the criminal proceeding in favor of the accused. See 1A MARTIN A. SCHWARZ & JOHN E. KIRKLIN, SECTION 1983 LITIGATION, CLAIMS AND DEFENSES § 3.20, at 325 (3d ed. 1997) (discussing Singer, 63 F.3d 110 (2d Cir. 1995)). Plaintiff Harmon alleges that both Patterson and Cameron have violated his constitutional rights, and are liable under Section 1983. Given the analytical backdrop outlined above, the Court will now endeavor to determine whether either Defendant is entitled to summary judgment with respect to Harmon's

constitutional claims.

A. <u>Defendant Sandra Cameron</u>

    1. <u>Section 1983 Claim</u>

        a. <u>Constitutional Deprivation/State Action</u>

Defendants Cameron and Patterson do not dispute that Harmon's arrest on October 21, 1999 was a deprivation of Harmon's liberty consistent with a Fourth Amendment seizure. In addition, it is undisputed that Defendant Cameron initiated legal process against Harmon by executing the affidavit that became the basis for the issuance of the arrest warrant. A federal malicious prosecution claim permits damages for a deprivation of liberty where the deprivation is pursuant to a seizure effected by legal process. If there has been an arrest pursuant to an arrest warrant, the "pursuant to legal process" prong is most clearly established. <u>See, e.g.</u>, <u>Nieves v. McSweeney</u>, 241 F.3d 46, 54 (1st Cir. 2001) (discussing what would constitute a Fourth Amendment "seizure" in the context of a warrantless arrest). In the instant case, Harmon's arrest was a "seizure" pursuant to "legal process," and was catalyzed by Cameron's swearing out an arrest warrant.

However, more is required. Section 1983 plaintiffs must establish both the deprivation of a right secured by the Untied States Constitution or federal laws and action under color of state law. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144 (1970); <u>Motes v. Myers</u>, 810 F.2d 1055, 1058 (11th Cir. 1987); <u>Scott v. Dixon</u>, 720 F.2d 1542, 1545 (11th Cir. 1983). Subsumed under the second prong of the framework outlined in *Singer*, that the deprivation

of liberty resulted from a "governmental" seizure, is the state action requirement.  Before

Cameron may be held liable under Section 1983, she must have been a "state actor" in

instigating Harmon's arrest.

The state action requirement of Section 1983 may be satisfied if the constitutional

deprivation results from a private person's use of a state procedural law to effectuate a

purpose not intended by state law and not permitted by the constitution.   Lugar v.

Edmondson Oil Co., 457 U.S. 922, 937 (1982).[6]  Essentially Harmon argues that Cameron's

purpose in having Harmon arrested was personal (she wanted to prevent Harmon from

injuring her husband's legacy by removing his name from the monument), rather than

because she feared that he was committing a crime.   The Court in *Lugar* established that the

state action requirement is satisfied when the charging party "is a state official, . . . has acted

together with or has obtained significant aid from state officials, or because his conduct is

otherwise chargeable to the state."  Lugar, 457 U.S. at 937.  The relationship between a

private party and the state which permits a determination that the private party was a "state

actor" is stated in *Lugar* as follows:

> Private persons, jointly engaged with state officials in the
> prohibited action, are acting "under color" of law for purposes
> of the statute.  To act "under color" of law does not require that
> the accused be an officer of the State.  It is enough that he is a
> willful participant in joint activity with the State or its agents.

---

[6]The *Lugar* Court noted that the Section 1983 requirement of "under color of state law"
has the same meaning as "state action" required under the Fourteenth Amendment.  See, Lugar,
457 U.S. at 929).

> The Court of Appeals erred in holding that in this context "joint participation" required something more than invoking the aid of state officials to take advantage of state-created attachment procedures. . . . Whatever may be true in other contexts, this is sufficient when the State has created a system whereby state officials will attach property on the *ex parte* application of *one party to a private dispute*.

*Motes*, 810 F.2d at 1058-59 (quoting Lugar, 457 U.S. at 941-42) (emphasis added by the *Motes* court).

The authority to deprive a person of a liberty interest by arrest and criminal prosecution is one created by state law. Motes, 810 F.2d at 1058. It is undisputed that Cameron utilized the apparatus of the State in initiating Harmon's arrest, and was present at the scene in order to provide information to the responding police officer on October 16, 1999. In addition, Harmon alleges facts that, if true, would support a finding that Cameron knew that Harmon was not committing a crime. Harmon alleges (1) that Patterson gave him permission to change the sign so long as Harmon's organization provided the money needed, (2) that Cameron knew that, at the very least, Harmon believed he had a right to be making the changes to the sign because Harmon openly communicated his intentions to Cameron. As Cameron and Patterson were longtime friends, a reasonable jury could also infer that Patterson had communicated to Cameron that he had given the Association permission to change the sign. In short, because Harmon has presented genuine issues of material fact with respect to (1) the legality of Cameron's purpose in pursuing Harmon's arrest, and (2) the extent to which Cameron "jointly participated" with the State in effecting Harmon's arrest,

summary judgment on this score is premature.  Cf. Motes, 810 F.2d at 1059 (finding summary judgment was granted erroneously due, in part, to the existence of state action on nearly identical facts); Scott, 720 F.2d at 1546 (same).

### ii. Probable Cause/Qualified Immunity

Cameron also disputes that Harmon is able to prove the absence of probable cause to arrest with respect to his October 16 incarceration as required under the *Singer* standard discussed above.  "A substantive element of the claim of malicious prosecution is the absence of probable cause." Smith v. Vaughn, 946 F. Supp. 957, 962 (M.D. Fla. 1996). Stated differently, "if there are undisputed facts in the record establishing that the defendant had probable cause to pursue the criminal indictments, the plaintiff cannot recover for malicious prosecution." United States Steel, LLC v. Tieco, Inc., 261 F.3d 1275, 1290-91 (11th Cir. 2001).  Defendants argue that probable cause existed to arrest Harmon based on two premises: (1) that Harmon's conviction in municipal court is prima facie evidence of probable cause to arrest, despite the fact that the conviction was subsequently overturned,[7]

---

[7]The defendants also appear to challenge that Harmon's subsequent acquittal can fulfill the "favorable termination" prerequisite to the plaintiff's federal malicious prosecution claim. See, Defendants' Reply Brief at 15 n.39.  Courts have found the favorable termination requirement to be met by virtue of an acquittal, an order of dismissal reflecting an affirmative decision not to prosecute, a dismissal based on the running of the statute of limitations, an entry of nolle prosequi, and, in some cases, a granted writ of habeas corpus. See, Uboh, 141 F.3d at 1005 (citations omitted).  The fact that Harmon was acquitted is what is relevant to his ability to maintain a Section 1983 malicious prosecution action; his actual innocence on the underlying charge is irrelevant. See, Smith v. Holtz, 87 F.3d 108, 113 (3d Cir. 1996) (citing *Restatement of the Law of Torts* §§ 659, 660).  For the purposes of the motion, the Court finds that Harmon's acquittal on appeal to the Circuit Court is a "favorable termination," regardless of the grounds for the jury's decision.

and (2) because Cameron could have reasonably believed that Harmon was committing a crime–that there was "arguable" probable cause to arrest Plaintiff.

Under Alabama law, a conviction by a municipal court is prima facie evidence of the existence of probable cause to arrest. See Ex parte City of Gadsden, 718 So. 2d 716, 719 (Ala. 1998) (citations omitted).   As a preliminary matter, it is not exactly clear to what extent the municipal court conviction bears on Harmon's *federal* cause of action.   In Haddock v. Christos, 866 F. Supp. 170, 174-77 (M.D. Penn. 1994), the district court responded to a claim by the defendants that the original conviction established, as a matter of law, probable cause to arrest. The court discussed in great detail the Supreme Court's decision in Heck v. Humphrey, 512 U.S. 477 (1994), and concluded that the Court's opinion clearly contemplates that neither an initial probable cause determination nor a conviction later overturned may act as a bar to a federal challenge to the prosecution. The Court stated:

> Thus, to return to our issue, as Justice Souter indicates [in his dissent], Justice Scalia's majority opinion in *Heck, supra,* by implication, if not directly, contravenes defendants' argument that an initial finding of probable cause abrogates the right to bring a Fourth Amendment claim. Justice Scalia's exposition of the elements of the claim resolves the issue. He states that a prisoner must show that the conviction or sentence has been "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *This statement has meaning only if the initial conviction . . . does not bar a subsequent action challenging the conviction.*

See Haddock, 866 F. Supp. at 177 (citations omitted).

Even if Alabama law regarding probable cause is determinative of the contours of the federal cause of action, Harmon has introduced evidence that, if true, rebuts the presumption of probable cause.[8]  However, intertwined with the question of probable cause is the issue of qualified immunity.  Under the latter doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  "The right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear such that a reasonable official would understand that what he is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  The standard is an objective one, Harlow, 457 U.S. at 818, and therefore does not include an inquiry into the [defendant's] subjective intent or beliefs.  Anderson, 483 U.S. at 639.  In sum, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).

In an action for malicious prosecution brought under Section 1983, a plaintiff must demonstrate the absence of probable cause.  See, e.g., Smith, 946 F. Supp. at 962.  However, as the federal case law makes clear, this flavor of probable cause that the plaintiff must

---

[8]"The prima facie showing of probable cause for the arrest may be rebutted only when the evidence clearly overcomes the presumption arising from the fact of the conviction."  Kmart Corp. v. Perdue, 708 So. 2d 106, 109 (Ala. 1997).

demonstrate to have been lacking is "actual probable cause," or "probable cause in fact." See Von Stein v. Brescher, 904 F.2d 572, 579 (11th Cir. 1990) (citing Gorra v. Hanson, 880 F.2d 95, 97 (8th Cir. 1989)). In contrast, when determining whether qualified immunity exists, the dispositive issue is whether the defendant had "arguable probable cause." See id. The test for determining this latter type of probable cause is, if officers of reasonable competence, possessing the same knowledge and otherwise in the same circumstances as the arresting officers could disagree on the existence of probable cause to arrest. If so, the defendant officers are immune. See Malley, 475 U.S. at 341.

Qualified immunity from suit protects government officials so that they may serve the public unfettered by the fear of legal liability. See Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989). Because different policy concerns are implicated, however, qualified immunity does not always protect private party state actors from suit under Section 1983. See, e.g., Domina v. Van Pelt, 235 F.3d 1091, 1096 (8th Cir. 2000) (citing Richardson v. McKnight, 521 U.S. 399, 403-404)). Sometimes an individual who happens to be a public official acts outside of her official capacity, thus becoming a private individual with respect to such activity. In such scenarios, the individual is not entitled to public official immunity, even though her pay check comes from the State. See, Anderson v. Creighton, 483 U.S. 635 (1987); see also, In re Allen, 119 F.3d 1129, 1139 (4th Cir. 1997) (Luttig, J., dissenting), reh'g denied en banc. In the federal malicious prosecution context, when a public official acts outside the scope of his employment and initiates legal process against an individual to

achieve private ends, the official is rendered a "private citizen" and qualified immunity does not apply. See, Motes v. Myers, 810 F. Supp. 1055, 1058 (11th Cir. 1987) (holding that defendant was acting in his individual capacity as a private citizen, and not in his official capacity as a public official when he initiated plaintiff's arrest, and therefore finding qualified immunity inapplicable).

Defendant Cameron is the Director and Nutrition Manager of the B.N. Mabra Community Center. As Director, the record indicates that Cameron spearheaded the ongoing redecoration efforts at the Center; as Nutrition Manager Cameron oversaw a program dedicated to providing nutritious food to the elderly. In feverishly pursuing Harmon's arrest on a Saturday (a day on which Cameron does not work at the Center), it appears that Cameron acted outside the ambit of her official duties. For this reason, the Court finds that Cameron acted as an individual and not as a government official.

Finding that Cameron acted as an individual does not end the qualified immunity inquiry. In 1992, the Supreme Court decided that private defendants who are subject to Section 1983 liability for invoking state attachment, garnishment, and replevin statutes are not entitled to claim a qualified immunity defense. Wyatt v. Cole, 504 U.S. 158 (1992). The Court revisited the issue of qualified immunity for private party state actors in Richardson v. McKnight, 121 S. Ct. 2100 (1997). In *Richardson*, the Court ruled five-to-four that private prison guards who are sued under Section 1983 may not assert the defense of qualified immunity. The *Richardson* Court noted that *Wyatt* "tells us . . . to look both to history and

to the purposes that underlie government employee immunity" in order to determine whether a private person is immune from suit under Section 1983. Id. at 2104. The Eleventh Circuit in Hinson v. Edmond, 192 F.3d 1342 (11th Cir. 1999), applied *Richardson* and held that a private physician who provided medical services to prison inmates was not entitled to qualified immunity. The court relied on the facts that (1) there was no "firmly rooted" tradition of immunity for privately employed prison physicians, (2) the physician was employed by for-profit organization (and thus has financial, "market driven" incentives to do his job properly), and (3) he performed his work with limited government oversight and supervision. Id.

None of the factors that might counsel in favor of finding that an individual acting as a private citizen is entitled to qualified immunity, under *Richardson* or *Hinson*, suggests that Cameron is so entitled. There is no tradition that this Court is aware of, firmly-rooted or otherwise, for finding that private individuals acting to resolve private disputes may be immune from suit. See, e.g., Motes, 810 F.2d at 1059-60; Scott v. Dixon, 720 F.2d 1542, 1544-46 (recognizing that utilization of state arrest procedures to settle private disputes states a cause of action under section 1983, and implicitly that qualified immunity does not protect private actors in such context). As Cameron did not work pursuant to a government contract or under government supervision when she initiated Harmon's arrest, she is not a private individual who may claim immunity from suit.

The foregoing analysis, although circuitous, is a necessary antecedent to determining

whether there was "probable cause" to arrest Harmon. Because Cameron is not entitled to qualified immunity, she is therefore unable to avail herself of the more forgiving "arguable probable cause" standard discussed by the Eleventh Circuit in *Von Stein*. The determinative standard governing Harmon's Section 1983 malicious prosecution claim is whether there was "actual" probable cause. The Court must therefore evaluate for some minimal showing of credibility any evidence that Cameron did not have probable cause to seek Harmon's arrest under two Alabama statutes.

Both Alabama criminal statutes under which Harmon was initially convicted require the element of *mens rea*. Harmon was prosecuted for solicitation of criminal mischief in the second degree:

> (a) A person is guilty of criminal solicitation if, *with the intent that another person engage in conduct constituting a crime*, he solicits, requests, commands or importunes such other person to engage in such conduct.

ALA. CODE § 13A-4-1 (1975) (solicitation) (emphasis added)

> (a) A person commits the crime of criminal mischief in the second degree if, with intent to damage property, *and having no right to do so or any reasonable ground to believe that he has such a right*, he inflicts damage to the property in an amount which exceeds $250.00 but does not exceed $1,000.00.

ALA. CODE § 13A-7-22 (1975) (criminal mischief in the second degree) (emphasis added).[9]

---

[9]In *Von Stein*, the criminal statute under which the Plaintiff was initially prosecuted had never been subject to judicial interpretation. See *Von Stein*, 904 F.2d at 579. This factor weighed heavily in favor of the court's finding that "reasonably competent persons could disagree on [the] interpretation of the statute" embraced by the officer defendants. Id. The *Von Stein* court therefore found that "arguable" probable cause to arrest the plaintiff existed. Id. at

It is undisputed that Cameron knew, several days before October 16, that Harmon was planning on altering the monument.  It is also undisputed that Harmon used only the Association's money to effect the changes, as was instructed by Patterson.  If Harmon's version of the facts is credited, Cameron knew that Harmon had at least a genuinely held belief that he was entitled to alter the monument.  What is disputed is whether Harmon's belief was in fact reasonable. Patterson claims that he did not give Harmon the "green light" to make the alterations, while Harmon claims that Patterson did.  However, those facts do not effect whether Cameron had probable cause to believe that Harmon was committing a crime on October 16, 1999.  Therefore, Plaintiff's version of the facts could warrant the conclusion that Cameron possessed information that made it objectively unreasonable for a private actor in her position to believe that the Harmon's arrest was not patently abusive.  In cases where the reasonableness of a defendant's probable cause determination turns on the credibility of the defendant, summary judgment is inappropriate.  See, e.g., Losch v. Borough of Parkesburg, Pa., 736 F.2d 903, 909 (3d Cir. 1984) (citations omitted).  This Court finds that, with respect to Defendant Cameron, Harmon has demonstrated adequately the existence of issues of material fact regarding the absence of probable cause to initiate his arrest on October 16, 1999.  This Court further finds that summary judgment is therefore due to be denied as to Defendant Cameron on Harmon's Section 1983 claim.

---

580. This Court is aware of no such uncertainty with respect to the two Alabama criminal statues under which plaintiff was prosecuted which might militate in favor of finding probable cause to have existed.

2. <u>State Law Claims</u>

Harmon also alleges that Cameron violated state law by initiating his arrest and ultimate prosecution. Specifically, Harmon claims that Cameron is subject to liability for the torts of false imprisonment and malicious prosecution, and that Cameron is not entitled to assert discretionary function immunity.

In her brief, Cameron argues that this court should extend immunity to her because she was performing a discretionary function of a state office. The entirety of Cameron's argument is as follows: "All of the allegations directed at the individual Defendants in this case involve the exercise of their discretion. The individual Defendants are clearly entitled to discretionary function immunity with respect to the Plaintiff's allegations in this case." Defendant's Brief, at 25. Although it is doubtful, the Court will assume that, with such bare conclusions, Cameron has made out the requisite prima facie showing necessary to shift the burden to Harmon to produce substantial evidence. <u>Matthews v. Alabama Agricultural & Mechanical University</u>, 787 So.2d 691, 697-98 (Ala. 2000); <u>Underwood v. Allstate Ins. Co.</u>, 590 So.2d 258, 259 (Ala. 1991).

A state employee who is sued in his individual capacity may be entitled to qualified immunity if he was engaged in the exercise of a discretionary function within the scope of his employment. <u>Nance v. Matthews</u>, 622 So.2d 297 (Ala.1993). Whether a defendant was exercising a discretionary function and therefore is immune from liability is a question of law for the trial court. <u>Grant v. Davis</u>, 537 So.2d 7, 9 (Ala. 1988). As the Court has already

determined that Cameron was not acting "within the scope of her employment" in having

Harmon arrested, discretionary function immunity under Alabama law does not apply.

With respect to Harmon's two substantive claims, Cameron is entitled to summary

judgment on the false imprisonment claim, but not on the malicious prosecution claim.

> False imprisonment is an intentional tort, not a tort of
> negligence. In an action to recover damages for illegal arrest or
> false imprisonment the only essential elements are the arrest or
> detention and the unlawfulness thereof. With regard to the
> element of unlawfulness in the tort of false imprisonment, the
> law has always made a fundamental distinction between a
> detention effectuated pursuant to process and detention which is
> not predicated on process. *An action for false imprisonment will
> lie where a person is unlawfully detained under a void process,
> or under no process at all, and can not be maintained where the
> process is valid, no matter how corrupt may be the motives of
> the person suing out the process or how unfounded the
> imprisonment may be . . .. Where the arrest is by valid process
> regularly sued out, action for malicious prosecution is the only
> remedy.*

Joseph v. Home Depot, 246 Ga. App. 868, 872-73, 542 S.E.2d 618 (2000); accord, Burt v.

Ferresse, 871 F.2d 14, 17 (3d Cir. 1989); Broughton v. State, 335 N.E.2d 310, cert. denied,

423 U.S. 929 (1975) ("[t]he distinction between false imprisonment and malicious

prosecution in the area of arrest depends on whether or not the arrest was made pursuant to

a warrant."); Anthony v. White, 376 F. Supp. 567, 571 (D. Del. 1974); Genito v. Rabinowitz,

225 A.2d 590, 592 (N.J. App. Div. 1966).  Such is also the law in Alabama.  See Sears,

Roebuck & Co. v. Alexander, 252 Ala. 122, 124, 39 So.2d 570, 571 (1949) ("We have a line

of cases which lay down the rule that a suit for malicious prosecution of a criminal charge

contemplates a lawful arrest and is in case, whereas one for false imprisonment contemplates an unlawful arrest and is in trespass."). As Harmon was arrested pursuant to a warrant, he cannot maintain an action for false imprisonment under Alabama law. Therefore, summary judgment on this claim is due to be granted.

In order for a claim of malicious prosecution to be submitted to a jury, the trial court must determine that the plaintiff has presented substantial evidence of the following elements: (1) that a prior judicial proceeding was instituted by the present defendant, (2) that in the prior proceeding the present defendant acted without probable cause and with malice, (3) that the prior proceeding ended in favor of the present plaintiff, and (4) that the present plaintiff was damaged as a result of the prior proceeding. Delchamps, Inc. v. Bryant, 738 So.2d 824, 831 (Ala. 1999) (citing Fina Oil & Chemical v. Hood, 651 So.2d 253 (Ala. 1993)) (other citation omitted). In her motion, Cameron disputes only the second element of the standard cited in *Bryant*.

When probable cause exists, proof of the highest degree of malice gains the plaintiff nothing. Gulsby v. Louisville & N.R.R., 167 Ala. 122, 128-29, 52 So. 392, 394-95 (1910). Yet, when probable cause is shown to be lacking, malice is essential to recovery. Id. Where no other reasonable explanation exists for the conduct of the defendant, malice may be inferred. Johnson v. Smith, 503 So.2d 868, 869 (Ala.Civ.App.1987). However, the inference of malice from the lack of probable cause may be rebutted by evidence showing that the defendant acted in good faith. Huffstutler v. Edge, 254 Ala. 102, 47 So.2d 197 (1950);

Lunsford v. Dietrich, 93 Ala. 565, 9 So. 308 (1891). Put another way, good faith can

preclude a finding of malice on the defendant's part. United States Fidelity & Guaranty Co.

v. Miller, 235 Ala. 340, 179 So. 239 (1938).

Another expression of the test for proof of malice comes from *Lunsford v. Dietrich*,

where the Court rejected the defendant's contention that proof of malice required evidence

of a desire to injure. 93 Ala. 565, 569, 9 So. 308, 310 (1891). In *Lunsford* the court held that

the existence of any motive other than a bona fide purpose to bring the accused to

punishment constitutes malice for malicious prosecution purposes.

As discussed with respect to Harmon's federal claim against Cameron, Cameron may

not have had probable cause to believe that Harmon was committing a crime at the time she

initiated his arrest. The Court also finds that a reasonable jury could infer malice from the

facts of the case. Because Cameron has not raised evidence that she acted in "good faith"

to rebut the inference of malice, the Court finds that Harmon's claim for malicious

prosecution can withstand Cameron's motion for summary judgment.

B. Defendant Dr. Horace Patterson

1. Section 1983 Claim

Harmon also alleges that Defendant Patterson violated his Fourth Amendment rights

and is liable to him under Section 1983. Specifically, Harmon alleges (1) that Patterson

"acted behind the scenes" (presumably with respect to Harmon's arrest, but the Plaintiff's

brief is unclear on this point), (2) that Patterson arrived at the "crime scene" on October 16

and was "irrate [sic], angry and pointing his finger in Plaintiff's face," and (3) that Patterson "launched his own investigation" into the monument alteration incident the day after Plaintiff's arrest. None of these arguments is availing. This Court's review of the record makes clear that Harmon has not alleged facts sufficient to attribute legal causation of any constitutional deprivation to Defendant Patterson.

Rule 2.1 of the Alabama Rules of Criminal Procedure provides that "[a]ll criminal proceedings shall be commenced either by indictment or by complaint." Hunt v. Tucker, 875 F. Supp. 1487, 1518 (N.D. Al. 1995) (citing Cisco v. Alabama, 23 Ala.App. 446, 126 So. 610 (1930) (A felony charge cannot be initiated other than on an indictment.)). A private citizen does not "commence" a legal proceeding such that legal causation can be attributed to her unless she: (1) instituted the proceedings against the plaintiff; (2) knowingly made false statements to the police; or (3) requested, directed, or pressured the officer into swearing out the complaint for the plaintiff's arrest. Logan v. Caterpillar, Inc., 246 F.3d 912, 922 (7th Cir. 2001) (citing Randall v. Lemke, 726 N.E.2d 183, 185 (2000)). Normally, a citizen institutes a criminal judicial proceeding by filing a complaint. Id. (citing Schwarz v. Coulter, 1993 WL 398578 at *8 (N.D. Ill. 1993)).

It is undisputed that Patterson did not file a complaint against Harmon. Although it is perhaps suggested, Plaintiff has provided no evidence that would support a claim that Patterson conspired with Cameron to have Harmon arrested. Harmon also does not allege that Patterson provided any false information to any law enforcement officer, nor is it alleged

that Patterson pressured any officer into taking action against Harmon. As Harmon fails to

raise any genuine dispute of material fact with respect to Patterson's causal involvement in

his arrest or prosecution, summary judgment is due to be granted on this score.

### 2. State Law Claims

For the reasons discussed above with respect to Harmon's federal claim against

Patterson, Harmon's malicious prosecution claim against Patterson must also fail. Also, for

the reasons discussed above in reference to Harmon's false imprisonment claim against

Defendant Cameron, Harmon's analogous claim against Defendant Patterson must also fail.

The only other state law claim that Harmon asserts against Patterson is for defamation.

During the November 1, 1999 City Council meeting to decide what would be done about the

monument Patterson made the following comments:

> I think this is a sad day for the city. I think it also sends a
> dangerous message, because the next time some young fellow
> gets mad about something over there at Westside, or anywhere
> else in the City, if he does what Mr. Harmon did, if he goes and
> pays someone to break out a window or if he pays someone
> $20.00 to tear up something or to write something on a wall,
> then you can get out of it if you just simply say, you get a
> lawyer and then just, does a little side step.
> I don't care what anybody says, somebody is guilty of criminal
> solicitation when you caused damage to be done to a public sign
> that was paid for with taxpayer's money. And if you did it over
> in another neighborhood, you would have to cough it up or your
> would go to jail. And I'm saying the Westside area, Ward 1,
> should be treated with the same identical respect. *And just
> because you can afford to get a lawyer that will argue your case
> doesn't take away the stain of guilt.* And it will be this way until
> such time, Mr. President, until that organization says okay, we

> believe that this is a project that we want to take charge of, fine,
> take charge of it and do like everybody in America, pay for it.

Harmon argues that these comments are defamatory because Patterson suggests that, even if Harmon were acquitted of the criminal charges against, the "stain of guilt" on Harmon is indelible.   Harmon's defamation claim against Patterson must fail because one of the essential elements for the maintenance of a defamation claim is absent.   Moreover, Patterson is entitled to absolute legislative immunity with respect to these comments made in a city council meeting.

"'The elements of a cause of action for defamation are: 1) a false and defamatory statement concerning the plaintiff; 2) an unprivileged communication of that statement to a third party; 3) fault amounting at least to negligence; and 4) either actionability of the statement irrespective of special harm [(per se)] or the existence of special harm caused by the publication of the statement [(per quod)].'" Drill Parts & Service Co. v. Joy Mfg. Co., 619 So.2d 1280, 1289 (Ala.1993) (quoting McCaig v. Talladega Publ'g Co., 544 So.2d 875, 877 (Ala.1989)).   Harmon fails to allege what about Patterson's statement is "false."   The only objectively verifiable component of Patterson's diatribe is the statement suggesting that what Mr. Harmon "did" is that he caused damage to be done to a sign paid for by public funds.   Harmon does not dispute that he paid Smoot to alter the sign, or that the sign was paid for with public monies.   The balance of the homiletic speech was simply political posturing about the nature of equal treatment under the law.   The Plaintiff fails to demonstrate what

about Patterson's speech was false; therefore, Plaintiff's defamation claim must fail.

Even if Patterson's speech were defamatory, Patterson is protected by absolute legislative immunity.   Under <u>Bogan v. Scott-Harris</u>, 523 U.S. 44, 54 (1998), a city councilman is absolutely immune from prosecution for comments made "in the sphere of legitimate legislative activity.  Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it."  To be legislative, however, the act in question must be both substantively and procedurally legislative in nature.  <u>See In re Montgomery County</u>, 215 F.3d 367, 372 (3d Cir. 2000) (citing <u>Carver v. Foerster</u>, 102 F.3d 96, 100 (3d Cir.1996)).  An act is substantively legislative if it involves "policy-making of a general purpose" or "line-drawing."  <u>Id.</u>  It is procedurally legislative if it is undertaken "by means of established legislative procedures."  <u>Id.</u>

Although Patterson's comments may well have been motivated by a personal animus toward Harmon, they fit comfortably under the rubric of "general-purpose policy making." The legitimate goals of Patterson's speech were related to the fate of the public monument, with perhaps the longer-term goal of assuring more egalitarian treatment for Patterson's constituents.  The purpose of the November 1 meeting was to determine a solution to the monument dilemma; Patterson's speech was, at least superficially, relevant to that end. Whether a concomitant purpose of Patterson's speech was to diminish public support for his personal enemy Mr. Harmon does not make his speech "non-legislative."  Were all legislative speech motivated by a personal animus actionable,  politicians would find

themselves in the courtroom more often than not.  The Court finds that Patterson is entitled to absolute immunity from suit with respect to the comments at issue in this litigation. Therefore, the Court finds that Harmon's defamation claim cannot survive Patterson's motion for summary judgement.

## IV. CONCLUSION

Based on the foregoing, the Court finds that Defendants' motion for summary judgment (Doc. No. 9) is due to be GRANTED with respect to (1) all Plaintiff's claims against Defendant Patterson, and (2) Plaintiff's false imprisonment claim against Defendant Cameron, the Court finding no genuine issue of material and triable fact as to such claims and that Defendant is entitled to judgment as a matter of law.  With respect to Plaintiff's Section 1983 and state law malicious prosecution claims against Defendant Cameron, the Court concludes that Defendants' motion for summary judgment is due to be DENIED, the Court finding genuine issues of material and triable fact as to such claims.  Finally, pursuant to stipulation and/or abandonment, the Court finds that all other of Plaintiff's state law claims against Defendants Cameron and Patterson, as well as all claims against Defendants City or Eddie Tucker, are due to be DISMISSED WITH PREJUDICE.

DONE and ORDERED this 16th day of November, 2001.

H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE

Page 30 of  30